IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
VALDOSTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | : |
| | : |
| v. | : |
| | : |
| | : CASE NO: 7:24-CR-30 (WLS-ALS-1) |
| TERRY LEONARD MCMILLAN, | : |
| | : |
| Defendant. | : |
| _____ | : |

**ORDER**

Before the Court is Defendant's Motion to Suppress Evidence and Statements (Doc. 30). Therein, Defendant moves the Court to suppress statements made during an interview with law enforcement officials as well as evidence seized from a search of third party's home. For the reasons stated herein, Defendant's Motion to Suppress (Doc. 30) is **GRANTED-IN-PART** and **DENIED-IN-PART.**

### I. BACKGROUND

Defendant was charged in a one-count Indictment (Doc. 1) on August 14, 2024, with Possession of a Firearm by a Convicted Felon, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(8). Defendant filed the instant Motion to Suppress (Doc. 30) on January 29, 2025, wherein Defendant requested an evidentiary hearing on the Motion. The Government filed a timely Response (Doc. 32) on February 18, 2025. After granting the Parties' requests for continuances, the Court held an evidentiary hearing on the Motion on July 8, 2025. At the conclusion of the evidence, the Court provided the Parties with the opportunity to submit post-hearing briefs. (*See* Doc. 45). Defendant filed his Post Hearing Brief (Doc. 47) on August 26, 2025. The Government filed its own Post Hearing Brief (Doc. 48) on September 5, 2025. The briefing period having concluded, the Motion is ripe for resolution.

### II. FACTUAL FINDINGS

At the July 8, 2025 evidentiary hearing, the Government presented two witnesses, Lowndes County Sheriff's Office officials Investigator Brandon Durrance and Sergeant

1

Jeremy Marquez, and three exhibits, which were admitted without objection. Defendant did not put on any witnesses or present any exhibits, although the Court advised Defendant of his right to testify and to present evidence on the motion. (*See* Doc. 46 at 6). Upon review and consideration of the exhibits, witness testimony, and the Parties' arguments, the Court makes the following findings of fact.

In June of 2023, Durrance received an anonymous tip about two individuals: Garrett Slocumb and Defendant Terry McMillan. (Doc. 46 at 8). The tipster provided detailed information about Slocumb, specifically that he was in possession of a Smith & Wesson handgun and was staying at 4200 Deercrest Drive in Valdosta. (*Id.*) Durrance was able to corroborate the tipster's information that Slocumb was in possession of firearms by reviewing Facebook messages between Slocumb and an individual named Brandon Russ, who was the subject of an unrelated investigation. (*See* Doc. 46 at 10–12; Govt. Ex. 2). The tipster didn't provide any specific details about Defendant, simply stating that McMillan "was staying at an unknown address and was in possession of various firearms." (Doc. 46 at 15:3–8). Durrance confirmed that both men were on probation for a felony offense. (*Id.* at 9, 15).

On July 10, 2023, Slocumb tested positive for marijuana during a routine visit at the Community Supervision Office. (Doc. 46 at 12:22–25). Durrance was notified of the failed urinalysis, and he along with Marquez and two other officers, William Neel and Calvin Manac, accompanied Slocumb to his grandmother's house at 4200 Deercrest Drive for a search based on Slocumb's Fourth Amendment waiver in accordance with his probation conditions.[1] (*Id.* at 13). Slocumb told investigators that no one, other than potentially his grandmother, should be at the home when they arrived. (*Id.* at 14). McMillan, however, was at the house when investigators arrived because he had slept over the night prior. (*Id.*) The entire series of events was captured on the investigators' body cameras.

Police did not detain or arrest McMillan immediately. Instead, they conducted a search of the house, including all areas that Slocumb had access to as well as his bedroom.

---

[1] This waiver permitted the warrantless search of Slocumb's person, place, property, and/or effects if there was reason to believe that he was in violation of the law or in violation of the conditions of his probation. The waiver also includes consent to the use of any evidence found of a violation to be used against said defendant in any criminal proceedings. (Doc. 46 at 9:15–24, 16).

Investigators found a handgun holster on the bedroom floor. (Doc. 46 at 17). Investigators found a backpack in a hallway closet adjacent to Slocumb's bedroom that contained an identification card for McMillan. (*Id.* at 17). Also inside of the backpack was an extended Pro Mag magazine compatible with Ruger EC9s. (*Id.*)

While investigators were searching the interior, McMillan first appeared on the scene when he entered the residence through the back door. (*Id.* at 18). This was the first time investigators encountered McMillan who said he had been outside on the back patio. (*Id.* at 39). For approximately ten minutes, McMillan stood unrestrained in the living room, moving about freely and occasionally engaging in casual conversation with the investigators, including Marquez. (*Id.*); (*see* Ex. 3, Marquez Body Worn Camera footage, at 5:08–15:30). Eventually, another investigator entered from the back door and placed Slocumb in handcuffs, explaining that weapons had been discovered in the backyard. (*Id.* at 13:48). In fact, a black Smith & Wesson M&P pistol and a Ruger EC9s with serial number of 457-14300 were found in the backyard near a shed, and 9-millimeter shell casings littered the backyard. (Doc. 46 at 18–19). Marquez then asked McMillan if he was also on probation, and McMillan confirmed that he was. (Ex. 3 at 14:40).

It was then that investigators advised McMillan that he was being detained and was no longer free to leave. (*Id.*) McMillan attempted to call his mother, and officers instructed him to put his phone down. (*Id.* at 15:06-15:16). McMillan initially resisted but later complied, stating he was autistic as officers handcuffed him. (*Id.* at 15:16-16:44). Investigator Manac informed McMillan that he was being detained due to the weapons found in the backyard, and McMillan stated for the first time that he did not want to talk to officers. (*Id.* at 17:20–49). McMillan provided his name and date of birth at the request of officers and was subsequently escorted by Marquez and Manac outside to the back patio. (*Id.* at 18:18–35). Investigators separated McMillan from those inside to talk with him "without all the commotion" happening inside. (Doc. 46 at 48).

Investigators proceeded to continue questioning McMillan after escorting him outside. Marquez verbally advised McMillan of his *Miranda* rights, and the questioning continued for nearly fifty more minutes. At several times during this questioning, McMillan told investigators

3

that he didn't want to talk to them anymore. (Ex. 3 at 31:19, 36:03, 36:19). The investigators ignored these statements and continued questioning him. McMillan was handcuffed for the entire time he was questioned. Eventually, McMillan made incriminating statements regarding the firearms and accessories recovered during the search and about his role as a middleman in firearm transactions. McMillan was subsequently indicted by a grand jury in the instant case on one count of possession of a firearm by a convicted felon.

### III. LAW AND ANALYSIS

Defendant moves to suppress evidence obtained and statements made by him during the search of Slocumb's house on July 10, 2023. (Doc. 30 at 1). Defendant asserts four general arguments: (1) Lowndes County investigators seized him based on an unreliable anonymous tip, (2) even if the stop of Defendant was justified initially, investigators unreasonably prolonged his detention, (3) investigators did not have reasonable suspicion or probable cause to search Defendant's backpack without a warrant, and (4) investigators failed to cease questioning Defendant after he invoked his right to remain silent. (*See generally* Doc. 30). For ease of analysis, the Court first resolves the Fourth Amendment issues and then the Fifth Amendment issues.

#### A. Fourth Amendment

The Fourth Amendment of the United States Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Defendant, as the movant, "bears the burdens of proof and persuasion" that his Fourth Amendment rights have been violated. *United States v. Cooper*, 133 F.3d 1394, 1398 (11th Cir. 1998) (citing *United States v. Eyster*, 948 F.2d 1196, 1209 (11th Cir. 1991)). Defendant moves to suppress the firearm recovered from the assertedly illegal search of Garrett Slocumb's home on July 10, 2023, and challenges the circumstances of his detention during said search. Defendant's motion raises two discrete issues: (1) whether investigators had reasonable suspicion to search Slocumb's house, and (2) whether investigators had reasonable suspicion to detain Defendant.

4

*1. The Search*

Defendant argues that investigators did not have reasonable suspicion or probable cause to search his backpack without a warrant. (Doc. 30 at 4). At the outset, the Court notes that while "[t]he Fourth Amendment's protection against unreasonable searches and seizures applies to probationers, [] probationers have a diminished expectation of privacy and 'are subject to limitations to which ordinary citizens are free.'" *United States v. Riley*, 706 F. App'x 956, 959 (11th Cir. 2017) (quoting *Owens v. Kelley*, 681 F.2d 1362, 1367–68 (11th Cir. 1982)). One such limitation allows for the warrantless search of a probationer's home by law enforcement for investigatory purposes even when officers have only a reasonable suspicion—rather than probable cause—that criminal activity is occurring. *United States v. Knights*, 534 U.S. 112, 121 (2001); *see United States v. Carter*, 566 F.3d 970 (11th Cir. 2009) (holding that reasonable suspicion of criminal conduct, and not probable cause, was a constitutionally sufficient basis for warrantless search of probationer's home).

"Reasonable suspicion consists of 'a sufficiently high probability that criminal conduct is occurring to make the intrusion on the individual's privacy interest reasonable.'" *United States v. Yuknavich*, 419 F.3d 1302, 1311 (11th Cir. 2005) (quoting *Knights*, 534 U.S. at 121). To satisfy this standard, an "officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [the] intrusion." *Id.* In other words, an "inchoate and unparticularized suspicion or hunch of criminal activity" is not sufficient to meet the standard of reasonable suspicion. *Id.* In conducting this inquiry, courts look at the totality of the circumstances to determine whether the officer had "a particularized and objective basis for suspecting legal wrongdoing." *Id.* The "inquiry ultimately hinges on 'both the content of information possessed by police and its degree of reliability.'" *United States v. Bruce*, 977 F.3d 1112, 1117 (11th Cir. 2020) (quoting *Alabama v. White*, 496 U.S. 325, 330 (1990)).

Here, there are no facts to indicate or suggest that the search was unauthorized or otherwise improper. At the time of the search, Slocumb was on probation and, as a condition of his release, had waived his Fourth Amendment rights. In addition, investigators had received information, via the anonymous tip in June of 2023, that Slocumb was engaged in

5

illegal gun possession and sales at the Deercrest Drive residence prior to the search. This information was independently corroborated by Slocumb's Facebook messages with Brandon Russ in which the pair sent photographs of firearms and discussed the purchase of firearms. (Doc. 46 at 10:3–11). These specific, articulable facts, provide the minimal level of objective justification necessary to support a finding of reasonable suspicion. The Court thus finds, based on the totality of the circumstances, that the officers had reasonable suspicion to conduct a warrantless search of Slocumb's home, including the area near the backyard shed and the hallway closet. Therefore, the evidence recovered from the search, including the backpack allegedly connected to Defendant, is not subject to suppression.[2]

   2. *Investigatory Stop*

Defendant argues that investigators seized him based on an unreliable anonymous tip. (Doc. 30 at 4). "[A]n officer does not violate the Fourth Amendment by conducting a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Moore v. Pederson*, 806 F.3d 1036, 1044 (11th Cir. 2015). A *Terry* stop is a seizure under the Fourth Amendment because it restrains the freedom of the detainee to walk away or otherwise remove himself from the situation. *Id.* (citing *Terry v. Ohio*, 392 U.S. 1, 16 (1968)). The standard of "reasonable suspicion" that is required to justify a *Terry* stop is significantly more lenient than that of "probable cause," which is necessary to support a warrant. *Id.* (citing *Terry*, 392 U.S. at 16).

An anonymous tip, under the appropriate circumstances, can provide the basis for reasonable suspicion to make an investigatory stop. *Navarette v. California*, 572 U.S. 393, 398 (2014). The first step is to determine whether the tip provided to Investigator Durrance in June of 2023 is reliable. *See United States v. Bruce*, 977 F.3d 1112, 1117 (11th Cir. 2020) An anonymous tip bears adequate indicia of reliability if a caller (1) claims eyewitness knowledge of the events, (2) provides a contemporaneous report of said events, and (3) uses the 911

---

[2] The Government contends that McMillan has failed to demonstrate that he had a legitimate expectation of privacy in Slocumb's yard or residence. (Doc. 48 at 5). Because the Court finds that the search was supported by investigators' reasonable suspicion based on Slocumb's Fourth Amendment waiver, the Court does not reach the issue of whether McMillan had a legitimate expectation of privacy as an overnight guest. The Court also notes that McMillan neither presented nor pointed to any evidence supporting an assertion that he had any valid expectation of privacy in the places searched.

6

emergency system to make the report. *Id.* (citing *Navarette*, 572 U.S. at 398–400). Here, none of the three indicia are present, and the Court agrees with Defendant that the tipster's information as it pertained to McMillan was not reliable.

Even though the tip was not reliable, the investigatory stop and detention of McMillan was nonetheless lawful because it was supported by reasonable suspicion. At the time the investigators detained McMillan, they knew the following facts: (1) a tipster reported that Slocumb, a felon on probation, was in possession of firearms at the Deercrest Drive residence, (Doc. 46 at 8); (2) this information was corroborated by Slocumb's Facebook messages uncovered in an unrelated investigation, (*id.* at 10); (3) McMillan was also a felon who was alleged to also be involved in gun possession, (*id.* at 15); (4) both Slocumb and McMillan had waived their Fourth Amendment rights as a condition of probation, (*id.* at 9, 16); (5) guns and shell casing had been discovered in Slocumb's backyard during a search of the premises, (*id.* at 18–19); and (6) McMillan entered Slocumb's residence through the backyard shortly after investigators arrived to conduct their search, (*id.* at 27). Again, these specific, articulable facts, provide the minimal level of objective justification necessary to support a finding of reasonable suspicion that McMillan was involved in gun possession at the Deercrest Drive residence. The Court thus finds, based on the totality of the circumstances, that the officers had reasonable suspicion to conduct an investigatory stop of McMillan.

### 3. Length of Detention

Defendant contends that even if the investigatory stop was justified initially, investigators unreasonably prolonged his detention such that it exceeded a mere *Terry* stop and ripened into a full-scale arrest. (Doc. 30 at 7). On that basis he argues that his statements should be suppressed as the products of an arrest that violated the Fourth Amendment. (Doc. 47 at 9). As discussed above, the stop was justified at its inception which leaves the question of whether the continuation of the stop was reasonably related in scope to the circumstances giving rise to it—here, the need to confirm or dispel the suspicion that McMillan was illegally in possession of firearms.

When law enforcement officers seize a suspect under the pretenses of *Terry*, the stop must be "reasonably related in scope to the circumstances which justified the interference in

7

the first place." *Terry*, 392 U.S. at 19–20. The detention "must be temporary and last no longer than is necessary to effectuate the purpose of the stop[,]" and officers should employ "the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *Florida v. Royer*, 460 U.S. 491, 500 (1983). In making this determination, courts look at the totality of the circumstances, *see United States v. Simmons*, 172 F.3d 775, 778 (11th Cir. 1999), and consider factors such as (1) "the law enforcement purposes served by the detention," (2) "the diligence with which the police pursue the investigation," (3) "the scope and intrusiveness of the detention," and (4) "the duration of the detention." *United States v. Hardy*, 855 F.2d 753, 759 (11th Cir. 1988).

First, considering the law enforcement purpose served by McMillan's detention, the most important factor "is whether the police detained [him] to pursue a method of investigation that was likely to confirm or dispel their suspicions quickly, and with a minimum of interference." *Hardy*, 855 F.2d at 759. During a Terry stop, officers may "engage in brief and nonintrusive investigation techniques, such as noncustodial questioning of the detained person[,]" and they may not use an investigative stop to "subject a suspect to custodial interrogation that would ordinarily require formal arrest and Miranda warnings." *Id.* (citations omitted). Here, investigators did exactly that. Specifically, investigators detained McMillan once firearms were discovered in the backyard, the same area from which McMillan had come from when he was first encountered by investigators. While it may have been necessary to detain McMillan for officer safety in light of the firearms (*see* Doc. 46 at 40–41), it's clear that investigators primary purpose in detaining McMillan at that time was to question him about the firearms. Indeed, Investigator Marquez admitted that he escorted McMillan to the back patio to ask him some questions "without all the commotion" happening inside. (Doc. 46 at 48). And Marquez made the decision to advise McMillan of his *Miranda* rights because he "wanted to ask [McMillan] some questions about—that could be of an incriminating nature and [McMillan] was not free to go at that time." (*Id.* at 41). McMillan was handcuffed, separated from others inside the home, *Mirandized*, and questioned by officers at length. Thus, this factor weighs heavily against the detention remaining within the bounds permitted by *Terry*.

Second, these facts also cut against the next factor—"the diligence of the police in pursuing the investigation"—because the investigators conducted much of their investigation and search before detaining McMillan.

Third, the "actual scope and intensity of the intrusion" also weighs against a finding of reasonableness. McMillan contends that the conditions of his detention were essentially the equivalent of a custodial arrest. The Court agrees. While McMillan was not immediately removed to an office or a police station, a factor that the Supreme Court and the Eleventh Circuit have found significant in distinguishing *Terry* stops from custodial arrests, he was handcuffed, separated from Slocumb, and escorted to the back patio of the home. *See e.g., Royer*, 460 U.S. at 502–03; *Dunaway v. New York*, 442 U.S. 200, 212 (1979); *United States v. Espinosa-Guerra*, 805 F.2d 1502, 1509 (11th Cir. 1986). McMillan was then *Mirandized* and questioned at length by investigators, at which time he was not allowed to leave or move about freely. *See Hardy,* 855 F.2d at 760 (holding that the scope and intensity of the intrusion was minimal where detainees were not questioned by the officer, were able to speak freely and privately to one another, and were allowed to remain in their vehicle unrestrained).

Fourth, the detention lasted longer than was necessary to complete the investigation of Slocumb's residence. By the time McMillan was detained, investigators had already discovered the firearms near the shed, the shell casings in the backyard, and the backpack inside the hallway closet. McMillan remained handcuffed for approximately fifty more minutes before investigators transported him from the house. *See Hardy*, 855 F.2d at 761 (concluding that the length of the detention, which lasted fifty minutes, was "troubling" but ultimately did not invalidate the detention because of other facts that showed police acted with propriety).

Based on the totality of the circumstances, the Court finds that the investigative detention of McMillan exceeded the permissible scope of a *Terry* stop. However, the Court finds that what initially began as an investigative detention under *Terry v. Ohio* effectively ripened into a full-scale custodial arrest when investigators read McMillan his rights under *Miranda*, and that officers had sufficient probable cause to conduct a custodial arrest of McMillan based on the totality of the circumstances, including his status as a felon on

probation, the anonymous tip received by Investigator Durrance, and the evidence discovered during the search.

### B. Fifth Amendment

The Fifth Amendment provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself . . . ." The Government is thus prohibited from using "statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). Defendant moves to suppress all statements made after he first told investigators that he did not want to talk to them. (*See* Doc. 30 at 11–16). Defendant's motion raises two discrete issues: (1) whether investigators continued questioning him after he invoked his right to remain silent, and (2) whether, at any point, Defendant waived his right to remain silent and made voluntary statements to investigators.

#### 1. *First Invocation of the Right to Remain Silent*

"When a person undergoing a custodial interrogation states that he wishes to remain silent the questioning must end, and if he expresses a desire to consult with an attorney, the questioning must cease until one is provided for him." *United States v. Acosta*, 363 F.3d 1141, 1151 (11th Cir. 2004) (citing *Miranda*, 384 U.S. at 473–74). Law enforcement, however, is not obligated to stop an interrogation where the suspect's invocation of either right is ambiguous or equivocal. *Id.* Rather, the suspect "must articulate his desire to cut off questioning with sufficient clarity that a reasonable police officer in the circumstances would understand the statement to be an assertion of the right to remain silent." *Coleman v. Singletary*, 30 F.3d 1420, 1424 (11th Cir. 1994). Additionally, the Court "need not suppress spontaneous remarks which are not the product of 'interrogation.'" *United States v. Hall*, 716 F.2d 826, 830 (11th Cir. 1983) (citing *Rhode Island v. Innis*, 446 U.S. 291, 300 (1980)).

Here, McMillan first indicated that he did not want to talk to officers shortly after being handcuffed. (Ex. 3 at 17:49). Marquez informed Mr. McMillan that he did not have to talk and that "we can't compel you to give incriminating information," but that he did have to provide his name and birthdate, which McMillan did. (*Id.* at 18:10–15). Marquez and Investigator

Manac then escorted McMillan to the back patio so they could talk to him without the commotion inside the house. (*Id.*) Once outside, Manac and Marquez asked McMillan questions related to how he got in the backyard, how long he had been staying at the Slocumb residence, and where he resided. (*Id.* at 18:49–20:46). McMillan's statements made during this time were in direct response to officers' questions and were not spontaneous utterances. They were made after he stated that he did not want to talk and while he was handcuffed. Even though Defendant had not yet been advised of his *Miranda* rights, he unequivocally invoked his right to remain silent. Therefore, these statements, made after McMillan stated he did not want to talk and before Marquez recited the *Miranda* warnings are subject to suppression.

      2. Miranda *Waiver*

A defendant may waive his *Miranda* rights if that waiver is "made voluntarily, knowingly and intelligently." *Moran v. Burbine*, 475 U.S. 412, 421 (1986) (quoting *Miranda*, 384 U.S. at 444). The Government bears the burden of proving, by a preponderance of the evidence, both that Defendant waived his rights under *Miranda*, and that any statements made thereafter were voluntary. *Missouri v. Seibert*, 542 U.S. 600, 608 n.1 (2004); *see Miller v. Dugger*, 838 F.2d 1530, 1538 (11th Cir. 1988) ("[U]ncounselled statement[s] must be both voluntary and made after a knowing and intelligent waiver of the *Miranda* rights to be admissible."). To establish the validity of a *Miranda* waiver, the Government must make a two-part showing. First, the Government must show that the waiver was voluntary "in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Moran*, 475 U.S. at 421. Second, the Government must show that the waiver was knowing in that it was made "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.*

At the first step, to determine whether a confession is voluntary, the Court assesses "the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation." *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973). This inquiry focuses on whether there has been any "police overreach[]." *Colorado v. Connelly*, 479 U.S. 157, 163 (1986). Courts should consider factors such as "the defendant's intelligence, the length of his detention, the nature of the interrogation, the use of any physical force against him, or the

11

use of any promises or inducements by police." *United States v. Vanbrackle*, 397 F. App'x 557, 562 (11th Cir. 2010).

Here, the totality of the circumstances show that McMillan's statements during the next segment of his interaction with investigators were the product of his own free will. McMillan was verbally advised of his right to remain silent. (Ex. 3 at 20:32–21:12). He stated that he understood his rights and agreed to talk with officers and that he was not under the influence of any drugs or alcohol. (*Id.*) For the next ten minutes, McMillan answered Marquez and Manac's questions. Defendant has neither alleged that investigators used physical force or threatened him with the use of force, nor is there any evidence in the Record that force or threats were used against McMillan during this ten-minute window or during the duration of the interrogation.

At the second step of the waiver analysis, the Government must also show that the waiver was knowing and intelligent in that Defendant waived his rights with a "requisite level of comprehension." *Moran*, 475 U.S. at 421. No single factor is determinative. Rather, courts examine the circumstances of each case, including the background, experience, and conduct of the accused. *See Edwards v. Arizona*, 451 U.S. 477, 482 (1981).

Here, the totality of the circumstances again show that McMillan waived his rights knowingly and intelligently as he had the capacity to understand his rights, was advised of them, and understood them. Specifically, Defendant verbally acknowledged that he understood his rights when Investigator Marquez concluded his recitation of the *Miranda* warnings. Further, Defendant's criminal history and his probation status at the time of the interaction demonstrate a familiarity with the criminal justice system such that Defendant was aware of the consequences of giving a statement to law enforcement. Defendant did not ask any questions regarding these rights and appeared to be thinking clearly and logically at the time of the interview. Defendant, nonetheless, agreed to speak with investigators and did not request an attorney, despite being advised of his right to do so. As such, the Court finds that the waiver was intelligent and knowing.

In sum, having considered the totality of the circumstances, the Court finds that McMillan validly waived his Fifth Amendment rights to remain silent and to have counsel

present. Because McMillan waived his rights and his waiver was knowing, voluntary, and intelligent, and his subsequent statements were voluntary, McMillan's statements during the time stamps on the body worn camera video from 21:15 to 31:18 should not be suppressed.

### 3. Second Invocation of the Right to Remain Silent

The Court's analysis of McMillan's statements, however, does not end there because McMillan again told investigators at least two more times that he did not want to talk to them. (Ex. 3 at 31:19, 36:03–19). The Government concedes that McMillan's statements during a specific section of the body-worn camera footage were made after he properly invoked his right to remain silent. (Doc. 48 at 14–15). Thus, there is no dispute that these statements are inadmissible and subject to suppression. (*See* Ex. 3 at 31:19 to 36:33).

### 4. Third Invocation of the Right to Remain Silent

McMillan subsequently stated for a third time that he did not want to speak with officers. (Ex. 3 at 36:03 & 36:19). The admissibility of statements obtained after a person in custody has exercised his right to remain silent depends on "whether his right to cut off questioning was scrupulously honored." *Michigan v. Mosley*, 423 U.S. 96, 104 (1975) (holding that admitting statements obtained in a second interview conducted hours after the defendant invoked his rights in a first interview about a different crime, by a different police officer, in a different location did not violate *Miranda*). In this Circuit, four factors guide the Court's analysis on whether and under what circumstances questioning may be resumed, including:

> (1) whether "the initial interrogation ended immediately" upon invocation of the right to remain silent; (2) whether "a substantial amount of time elapsed" before questioning resumed; (3) whether the suspect "was again read his rights" before the second round of questioning; and (4) whether the second round of questioning was done "by a different officer about an unrelated crime."

*United States v. Gray*, 771 F. App'x 976, 979 (11th Cir. 2019) (quoting *Gore v. Sec'y for Dep't of Corr.*, 492 F.3d 1273, 1296–97 (11th Cir. 2007)).

Here, each of these factors weigh against resumed questioning. First, investigators did not end the initial interrogation the first time McMillan invoked his right to remain silent, nor did they cease their questioning the second or third time McMillan indicated that he did not want to talk to them. In fact, when McMillan asked investigators if they could end the conversation and take him to jail, Marquez stated that they "could do that" but that

13

investigators "would like to speak with [McMillan] more." (Id. at 36:29). Second, no amount of time lapsed between McMillan's invocation and the resumed questioning. Third, McMillan was not re-read his *Miranda* rights at any point during the entire interaction, which lasted over one hour. Fourth, each subsequent round of questioning was conducted by the same investigators, Marquez and Manac, and was related to the same investigation and crime.

Viewing the circumstances as a whole, the Court finds that investigators did not "scrupulously honor" McMillan's "right to cut off questioning" and thus violated his rights under *Miranda*. As such, all of McMillan's statements after the 36:03-time stamp on the body worn camera video should be suppressed.

## CONCLUSION

In sum, the Court finds, based on the totality of the circumstances, that investigators had reasonable suspicion to conduct a warrantless search of Slocumb's home and to conduct a *Terry* stop of Defendant. Therefore, the evidence recovered from the search is admissible. Further, the statements made before McMillan was advised of his *Miranda* rights, (Ex. 3 at 17:49–20:46), as well as all of McMillan's statements after the second invocation of his right to remain silent, (*id.* at 31:19), should be and are suppressed. Finally, McMillan's statements after he waived his Miranda rights but before re-invoking his right to remain silent are admissible. (*Id.* at 21:15–31:18). For the foregoing reasons, Defendant's Motion to Suppress (Doc. 30) is **GRANTED-IN-PART** and **DENIED-IN-PART**.

Further, the Court notes that a Motion to Continue (Doc. 51) was filed by Defendant on October 15, 2025. Therein, Defendant moves the Court for a continuance of the trial in this case currently scheduled to take place during the Court's November 2025 Valdosta Division trial term. In light of the Court's ruling on the instant Motion to Suppress, the Court will provide Defendant with an opportunity to withdraw his motion to continue and proceed to trial, should he wish to do so, by no later than Friday, October 24, 2025.

**SO ORDERED**, this 20th day of October 2025.

/s/ W. Louis Sands  
**W. LOUIS SANDS, SR. JUDGE**  
**UNITED STATES DISTRICT COURT**

14